WONG CHOW, WONG CHEW YOU, LAM KAI CHOW
and LAM YING CHIN, partners doing business under
the firm name of YEE WO CHAN & CO. *v.* THE
TRANSATLANTIC FIRE INSURANCE COMPANY,
Limited.

EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

SUBMITTED OCTOBER 6, 1900.        DECIDED OCTOBER 30, 1900.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

In an epidemic of bubonic plague the Health authorities set fire to
certain buildings declared to be infected, from which the fire spread
by accident to other buildings including the plaintiffs' store con-
taining goods covered by a policy of insurance. Held, that the
circumstances set forth in the opinion did not show that the loss
was caused by a civil commotion so as to exempt the insurers
under the clause in the policy that they should not be liable for
any loss or damage caused by civil commotion.

OPINION OF THE COURT BY FREAR, C.J.

This is one of three fire insurance cases argued at this term,
representative of many others, arising out of the burning of
"Chinatown" in the city of Honolulu on the 20th of last Jan-
uary. The action is for $5,000 upon a policy issued by the de-
fendant company, of Hamburg, Germany, upon the merchandise
contained in the plaintiffs' store on Maunakea street, a little
above King street, in this city.

The case was tried by the circuit court, jury waived, and judg-
ment rendered for the plaintiffs and now comes here on several
exceptions.

The only questions raised are whether there was a "civil com-
motion" and, if so, whether that caused the fire—so as to bring

the case within the provision of the policy that the company should "not be liable for any loss or damage caused by means of invasion, insurrection, riot, *civil commotion*, or military or usurped power."

The facts are briefly as follows: The bubonic plague broke out in Honolulu on December 12, 1899. A number of cases occurred in Chinatown, which was in an insanitary condition, and several in other parts of the city. Chinatown, consisting of fifteen blocks, bounded by the Nuuanu stream and Kukui, Nuuanu, Marine and Queen streets, was placed in quarantine by the Board of Health, and to maintain the quarantine the local militia was placed on duty. Subsequently the city of Honolulu was quarantined from the rest of the island and traffic with that as well as with the other islands and foreign ports was carried on only to a limited extent and under regulations of the Board of Health. The people organized "The Citizens' Sanitary Committee," which, acting under the directions of the Board, undertook the work of making a house to house inspection of the city twice a day. Several hundred people were engaged in this work. For a time the courts suspended business for the most part and business houses opened late and closed early in order to enable employees to assist in the work of inspection and other work connected with the plague. The quarantine was finally raised in the month of May, 1900.

In the early part of January the Board adopted fire as a means of disinfection and thereafter from time to time until the 20th of that month burned a number of buildings. After inspecting the locality, the Board on the 10th of that month passed a resolution declaring that a certain portion of what was known as Block 15, the block in Chinatown furthest inland or to the windward when the trade winds blew, was in an insanitary condition and infected by bubonic plague, that the infection could not be removed by any means but fire, and ordering that all the buildings within that portion of the block be destroyed by fire. The President of the Board thereupon directed one of the Fire Commissioners to burn such buildings. The Fire Commissioner caused the fire to be started by and under the supervision of the

11

Honolulu Fire Department on the morning of the 20th of January. The fire, having been so started, accidentally spread to Kaumakapili Church in the same block and thence through nearly all the blocks in Chinatown to the water front, including the store of the plaintiffs, which was several blocks from where the fire started. There was only a moderate breeze blowing at the time and no efficient cause intervened between the setting of the fire under the orders of the Health authorities and the burning of the merchandise in the plaintiffs' store. Such substantially are the facts as found by the trial court and supported by the evidence. That court found that these facts did not show a "civil commotion" within the meaning of the policy and it is to this that objection is taken.

Counsel for the defendant would have the court find that a civil commotion was occasioned upon the outbreak of the plague and continued until the 20th of January when the fire in question was started by the Health authorities. The phrase "civil commotion" is no doubt of broad meaning but it cannot be stretched to cover the condition prevailing in this city during the period preceding the fire in question. Naturally, courts have seldom been called upon to construe this phrase. Lord Mansfield, applying it to the riot acts of 1780, said: "I think a civil commotion is this, an insurrection of the people for general purposes, though it may not amount to a rebellion while there is a usurped power." *Langsdale v. Mason,* quoted in Joyce, Ins., Sec. 2581. This is said to have been quoted in *Portsmouth Ins. Co. v. Reynolds,* 32 Gratt (Va.) 622. 6 Am. & Eng. Enc. of Law, 2nd Ed. 291. In *Spruill v. N. C. Mut. Life Ins Co.,* 46 N. C. 126, a case of insurance upon the life of a fugitive slave who was shot by persons attempting to capture him, the court, holding that there was no civil commotion, said: "A commotion is defined by the lexicographer referred to, (Worcester) to be a tumult; and a tumult to be a promiscuous commotion of a multitude; an irregular violence; a wild commotion. A civil commotion, therefore, requires the wild or irregular action of many persons assembled together." It is true that in this case the business of the courts and of the community was more or less

interrupted, but that is not sufficient to make a civil commotion. There was nothing of a wild, tumultuous, violent, turbulent or seditious nature which the phrase is generally understood to imply and which it was intended to imply in this policy as shown by the words with which it is associated. The interruption to business was orderly, deliberate and for peaceful and laudable purposes. These words cannot be taken strictly in their etymological meaning—as a moving together not military, ecclesiastical, &c. If so, they would include the ordinary celebration of a holiday—when business is more interrupted than it was during the plague here, or they would even include many occurrences in the ordinary course of business or social life. The words have grown to have a different meaning. The plague or epidemic itself was not a civil commotion nor did it cause a civil commotion. There was, it is true, considerable excitement after the fire department lost control of the fire, for several thousand people were obliged to leave their homes in haste in order to escape the flames and had to be safely conducted elsewhere and not allowed to scatter in the uninfected portions of the city, but if there was a civil commotion then, it did not cause the fire. The fire caused it.

It may be that a fire of this kind is so unusual that the insurance company did not in fact contemplate it and that it contemplated only ordinary risks, but we must go by the terms of the policy and hold it to cover all loss or damage by fire not included in one of the excepted risks. The probable intention of the parties may aid in the construction of doubtful phrases in the policy, but cannot alter the plain meaning of its language.

If bubonic plague were named in the policy as one of the excepted risks it might be a nice question whether that was the proximate cause of the fire, but that was not mentioned as an excepted risk.

The plague itself was not a civil commotion and the facts of the case do not show that it caused a civil commotion prior to the fire in question. It is unnecessary to go further and say whether, if the condition existing prior to the fire could be properly described as a civil commotion, it, rather than the plague or the order of the Health authorities, was the cause of the fire.

The policy excepts losses caused by civil commotion, not losses which merely occur in time of civil commotion.

The exceptions are overruled.

*Paul Neumann* and *W. Austin Whiting* for the plaintiffs.

*L. A. Thurston* and *Robertson & Wilder* for the defendant.